Spencer Griffin, Tutor, *v.* William Waters.

In an action for the partition of the property of a succession, no claim can be allowed by the appellate court, which was not made before the court of probates, nor decided on by that tribunal.

Where the community has been dissolved by the death of the husband or wife, the survivor, with the heirs of the community, become co-proprietors of the estate; and where the surviving partner retains possession he becomes the *negotiorum gestor* of the heirs.

This was an action before the Court of Probates for the parish of Rapides, by the plaintiff as tutor of William and David Stokes, against Waters as surviving partner of the community formerly

---

existing between himself and his wife, and as tutor of Thomas Waters, their only child. There was a judgment, *Johnston*, J., homologating the partition made by the notary, and against the defendant for the sum of nine thousand four hundred and fifty four dollars, thirty eight cents, to be equally divided between the minors represented by the plaintiff.

*Lewis* and *Bryce*, for the plaintiff.

*Dunbar* and *Hyams*, for the appellee.

GARLAND, J.* This action was commenced for the purpose of enforcing a settlement and partition of the estate in community between the defendant and his deceased wife, the mother of the minors. The defendant, in the month of April, 1828, married Elizabeth Stokes, a widow, having two children, without any marriage contract; they lived together until July 10th, 1833, when she died, leaving one child, who is represented by his father, the defendant. Various inventories of the estate were made in the months of February, April, June, and August, 1835. In the month of June, in that year, the defendant prayed for the convocation of a family meeting to decide upon the terms upon which the property should be sold, he having ever since the decease of his wife had it in possession administering it, without authority, or making any inventory other than those mentioned as having been made in February, and April, 1835. These various inventories amounted to $52,412, but this sum is to be reduced by re-appraisements very considerably. No full inventory was ever made of the debts owing to the estate, and it is very difficult to ascertain their amount with any exactness. The property composing the succession was sold in August, 1835, at public auction, and purchased by the defendant for $41,022, and the estimate of the debts and money received, made by the probate judge, increased that sum to $76,117 52, from which the debts paid by defendant, the value of a slave brought into the community, and some other items were deducted, leaving a balance of $25,363 14, as forming the community. One half of this sum was assigned to the defendant, and the remaining half, with the addition of $1500 received by defendant from the

---

* By agreement with the counsel engaged in this case, the opinion of the court was prepared after the return of the judges from the Western District; and was delivered in New Orleans, the 31st of January, 1842.

estate of his wife, amounting to $14,181 57, was decreed to be divided between the two minors represented by Spencer Griffin, and their half-brother, represented by the defendant and his under tutor, making the sum of $4727 19 due to each. From this judgment the defendant has appealed, and in this court the plaintiff prays for an amendment of the judgment in his favor.

The record is voluminous, the testimony uncertain, and confused in some respects, and the accounts so generally and loosely kept, that it is impossible to approach to accuracy in coming to any conclusion.

The evidence shows that the defendant came from Kentucky in the latter part of the year, 1824, with a flat-boat load of western produce. What the value of this cargo was we cannot ascertain, but it appears that he had a partner (Wright) in the adventure, with an interest of a third, who says he put in between five and seven hundred dollars to purchase it. What this cargo was sold for, does not appear, but the witnesses say at a handsome profit. When the defendant left Kentucky, it is shown he was in very embarrassed circumstances, if not altogether insolvent. With the proceeds of their cargo of produce, the defendant and Wright purchased a steamboat called the Natchitoches, and by running her in the Red River trade, it is said, made a great deal of money, but what particular sum is not shown. With the funds raised in this manner, the defendant and Wright purchased successively, the steamers Florence and Miama, and with them, it is also in evidence, that they made much money, but no specific sum is proved, nor does it appear what became of the boats. In the spring or summer of 1827, the defendant purchased the steamer Dolphin for $8000 in partnership with Wright; and others, at different times, had an interest in her also. Wilson at one time owned a half; Soher, Goodman & Co., one sixteenth ; the defendant then purchased the whole boat except Wright's portion, and again sold half of her for $4000. Several witnesses swear that in the course of the summer and autumn of 1827 this boat made $6000 in the Red River trade. In the winter of 1827-8, the defendant ran the boat in the Ouachita trade, and there several witnesses say she made $8000, but what portion of these sums belonged to the defendant is not shown, as there has not been any settlement of the partnership accounts exhibited to us, and Wright

Griffin, Tutor, *v.* Waters.

says they had not been settled with him when he testified in this case in 1836. The marriage took place in April, 1828, whilst the Dolphin was engaged in the Ouachita trade, and some time before she left it for the season. So that a portion of what she made belonged to the community, but how much we cannot tell.

It is further established that at the time of the marriage the defendant had several slaves; but it is also proved that all of them died but one, who ran away; and none of them are mentioned on the inventory, so that it is unnecessary to remark further about them, than to say that whatever profits were made by them after the marriage belonged to the community. The evidence also shows that the defendant was concerned for some months in a produce store at Natchitoches, with McGuire, who says they did a good business, but how much was made does not appear with any certainty. He was also a partner with Culbertson in a store at Alexandria, in which his interest is shown by the books and evidence to have been $2750, which the probate judge allows and the plaintiff does not contest.

As before stated, the defendant appears to have left Kentucky much embarrassed. He was two thirds owner of a flat-boat cargo, costing, according to Wright's testimony, between fifteen and twenty one hundred dollars; he had several children in Kentucky to support and educate, he paid off some of his old debts, and invested the proceeds of his first adventure in a small steamboat, which although profitable must have been entirely lost from accident or decay; another was then purchased, a third, and a fourth, by all of which he is proved to have made money, but the amount is left indefinite. The defendant's counsel insists that he was worth at the time of his marriage $23,814 71, which was accumulated by his own industry and energies in about four years and three months on small steamboats, in partnership all the time with Wright, and at different times with other individuals. We cannot upon evidence so uncertain as that before us, admit that the claim is established, when it appears that so large a portion of the profits made were withdrawn, and invested in slaves, who afterwards died or ran away. This view of the case is confirmed by the evidence of Wright, who says that his partnership with the defendant was dissolved in 1829, the year after his marriage; that he then offered to

take $3000 for his third of what had been made, which defendant refused to give, but offered him $1800, and an acquittance for about $950, which Wright had withdrawn during the partnership. Their accounts consequently were not settled when the witness testified, although seven years or more had elapsed since the dissolution of the partnership. Taking then this offer of the defendant as a criterion of what the partnership with Wright was worth, it would seem that his share was worth about $5500, which was represented by seven slaves, proved to be valuable, and by his interest in the steamboat Cincinnati, which it appears did not turn out a profitable investment, although at the time of this dissolution, the heaviest losses by her had not been realized. Shriver says in his testimony that besides this property, defendant, at the time of his marriage, had considerable sums of money due him on Red River for freight and produce, and was according to *his estimate probably* worth $20,000, but it is not shown what portion, if any, of these debts were collected and went into the community.

All the property placed on the inventories is stated to belong to the community, without reservation or exception, and the law presumes it to be so; therefore all claims upon it must be established with sufficient certainty to enable a court to ascertain the amount with precision, or something approaching it.

In the summer after his marriage, the defendant went to Kentucky, and there built or purchased the steamer Cincinnati, in which Wright was a partner, by which operation he lost a considerable sum, in consequence of the failure of Soher, Goodman & Co. who purchased an interest in her; he also lost several slaves by the boat remaining in New Orleans for some time, when the yellow fever was prevailing. After this, the defendant owned the steamer Republican, which it seems he sold in a short time, and made very little by. He then purchased the steamer Planet, and sometime after the steamers Lioness, Gleaner, and Rapides, the two former were lost by accident, before having made much money, but the latter proved a very profitable concern. The gross amount earned the first season is shown to have been upwards of $51,000, and the profits large. The second year the boat did a very fine business, but not so much as the year she commenced running. The probate judge has said the community to the time of the death of his

wife, made by the steamers Rapides, Planet, and Gleaner, the sum of $19,360, and by the Lioness previous to her loss, $4521. In these results the evidence has not satisfied us that the judge erred.

The defendant and others then formed a company called the Red River Steamboat Line, of which the capital was $48,000; the boats were the Rapides, Caspian, and Lioness. The interest of defendant was one half, but the latter boat was lost in the month of May, 1833, after earning only $4521, as before stated; the Caspian made $5562 42, up to the time of his wife's death; and the profits of the Rapides are included in the sum of $19,360, herein mentioned.

During the existence of the community the defendant purchased a tract of land of upwards of one thousand acres, on Red River, above Alexandria; and a number of slaves were on it, at the time that his wife died. The inventory shows the names of eighteen as belonging to the community, and two had died in 1834, before the inventory was made. After the death of his wife, on the 10th of July, 1833, the defendant kept possession of all the property, land, slaves, the steamers Rapides and Caspian, and all the debts due the community; he made no inventory until the month of February, 1835, when a partial one was made; a second was made in April, a third in June, and a fourth in August of the same year. Then the plantation and all the improvements were said to belong to the community as before stated. In January, 1834, the defendant and Beamon purchased in partnership a plantation below Alexandria, when the former took all the community negroes off the community plantation, and put them on the plantation with Beamon; and in March afterwards, without any authority, he sold to Lambeth one half of the community tract of land for $7500, in consideration of a half interest in a large number of slaves, which Lambeth had sold him. Between them a partnership was formed, the community property was entirely separated and broken up, and a large plantation commenced for the benefit of the defendant and his partner. The community negroes were, in the early part of 1835, brought back to the common plantation, and the sum of $1500 allowed, in a settlement between Waters and Beamon, for their hire for the space of eleven months. During that time one valuable slave was accidentally killed, another died, and the defen-

dant now wishes to charge the community $5000 for the hire of the slaves of the partnership during the time they were on the land belonging to the community, and $14,000 for improvements made thereon, thereby reducing the whole value of the land to $6600, when the defendant had sold one half to Lambeth for $7500, before the improvements were made.

After the partition was made by the parish judge, acting as a notary, the plaintiff presented it to the probate court, praying for its homologation, with certain amendments. ·

1. That the community should be declared to be worth $100,000, as established by the evidence. This is not proved to our satisfaction. It is true, two witnesses testify that the defendant, at different times subsequent to the death of his wife, said that he was worth $100,000, but from the manner of those conversations, we think more reliance is to be placed on the evidence of Doty, who was the confidential clerk of defendant, and who says he believes that he knew more of defendant's affairs than he did himself. He says that defendant, at the time of the death of his wife, was worth between twenty and thirty thousand dollars. From the expressions used, we think the witness meant that the community was worth that sum, although he speaks of the defendant. In this view he is sustained by the probate judge, who has fixed the amount very nearly at the mean between those sums.

2. The plaintiff alleges that since the partition was made, the insurance on the steamboats Lioness and Gleaner, amounting to about $20,000, has been received by defendant, and that there was other property, particularly a pine wood's residence, which had not been divided. There is no evidence in the record to sustain these allegations; the probate judge therefore did not send the partition back to the notary, or decide on the application. In this, we think, he was correct. If the money has been received and the property exists, it may be hereafter divided according to the rights of the parties.

3. It is prayed that the partition be amended by charging the defendant with $3000, funds of the community, which he used to pay his separate debts. There is no satisfactory evidence in support of this allegation in the record.

4. It is urged that the community was enriched to the amount of

$25,000, by its interest in the Red River Steamboat Line, which defendant has not accounted for. Of this there is no sufficient evidence, and the judge did not err in rejecting it.

On the argument of the cause in this court, the counsel for the plaintiff insisted that the defendant ought to account for the sum of $4000, the difference between the first and third appraisement of one half the steamer Caspian. When first appraised, her value, in July, 1833, was stated in the inventory at $9000; when last estimated, in 1835, it was reduced to $5000. The plaintiff says that the defendant ought to account for this difference, or for what the boat made during those two years. What our opinion on the question may be, it is not necessary to state, as the claim was not made in the probate court, nor decided on by that tribunal. Code Pr., arts. 1029, 1030, 1031, 1032.

The first ground of objection filed by the defendant to the homologation of the partition, is, that the community was insolvent after the payment of its debts, and restoring to him the amount brought into the marriage. This objection covers a broad ground. We have recapitulated the evidence as much in detail as we could. To go into an argument upon it, is unnecessary. We do not think the community was insolvent, and are of opinion that the probate judge fixed the amount with as much correctness, as it could be ascertained by the testimony.

The second ground is, that there should have been deducted from the sum of $19,360, the amount due the steamers Rapides, Planet, and Gleaner, the sum of $12,000, for bad debts, expenses of collection, and other charges. Upon this objection we must first remark that the defendant has all the evidence of those claims in his possession, and has not shown, by testimony, any such extraordinary losses by bad debts or heavy expenses. We cannot say that the probate judge erred in overruling the objection.

The third objection is, that the sum of $25,000 should be allowed defendant, as the amount brought by him into the community. After a full examination of the grounds on which this objection rests, we are satisfied that there is no error in the judgment of the probate court upon it.

The fourth objection is, that the defendant should have been allowed the sum of $20,000 for the hire of slaves, and for improve-

ments made at his expense, since the death of his wife, on the plantation above Alexandria belonging to the community.

In addition to the facts already stated in relation to the removal of the community slaves from the land, and the possession by the defendant of all the property composing the succession, and the sale of one half to Lambeth, it further appears that he had a large amount of debts to collect; that he kept possession of the steamer Caspian for more than two years, running her in the Red River trade; it is proved she was a favorite boat with the public, and made a considerable sum of money. The profits made during these two years are not accounted for, and as the defendant contends that he was the co-proprietor and agent of the minors, who, for a long time after their mother's death, had no other representative than himself, we will presume that he acted honestly, and applied the profits of one portion of the common property to the improvement of the other. That the defendant supposed the plantation, and all the improvements, belonged to himself and to the heirs of his deceased wife, is shown by the inventory and probate sale. In both it is expressly called community property, and the defendant signs the acts containing the admission. The evidence is not very definite as to the value of the improvements, and the estimates of some of the witnesses seem extravagant. A cotton gin was put up, which it is proved cost about $2000; several large ditches were dug, and a number of a smaller kind. Other improvements, such as erecting buildings, clearing land, and making fences are proved. One of the witnesses estimates the improvements as giving an additional value to the land of $20,000; others estimate them at much less. Before the improvements were put on the plantation, the defendant had sold one half the land for $7500, which shows the whole was worth $15,000; in 1834 and 1835, it is shown that land increased rapidly in value; and that in August, 1835, the whole plantation and improvements sold for $25,600, on a long credit. The improvements could not then be worth more than $10,600, yet the defendant claims $20,000 of these minors, whose interest was only two-sixths of the whole, seeming never to have remembered that he was responsible for any part.

The counsel for the defendant urge that the community was dis-

solved by the death of the wife, in July, 1833, and that after that period, he and the minors were the co-proprietors of the estate. That is certainly true. 9 La. 583. They further say that the defendant was the *negotiorum gestor* of the minors, and rely upon the decision of this court in the case of *Broussard* v. *Bernard et al.* 7 La., 216. This is admitted. They then say that according to the decision in the case of *Percy* v. *Millaudon*, 6 Martin, N. S., 616, and the article 2278 of the Code, the defendant is entitled to compensation for the improvements put upon the property. We think there is an obvious distinction between the case of *Percy* v. *Millaudon*, and this. Percy and Millaudon were joint owners of an estate, both majors, and present. Millaudon went on to make extensive improvements, Percy stood by making no opposition, and afterwards refused to pay his portion of the expense. This court very properly held that he should pay. Compare the facts in this case with that relied on, and the distinction is plain. Here two of the co-proprietors are minors, incapable of acting, the defendant takes possession of their property, has no one appointed to represent them, makes no inventory for nearly two years, removes the slaves, sells a portion of the land, collects the debts, employs the steamboats in a profitable business, and renders no account of what is made, and then claims indemnity under a law, which says, ' equity obliges a proprietor whose business has been well managed, to comply with the engagements contracted by the manager in his name; to indemnify the manager for all personal engagements he has contracted; and to reimburse him all useful and necessary expenses.' We are clearly of opinion that the defendant does not bring himself within the provisions of the law he relies on.

The fifth objection is, that the defendant should have been allowed $10,000, for interest paid by him on the community debts, and for expenses in collecting the debts due to it. The evidence does not sustain this claim. The defendant had all the community property to pay the debts with ; if he has not disposed of it in the manner provided by law to pay those debts, it is his own fault. The mode of administering the estate according to law is plain ; the defendant did not adopt it, and he must take the consequences.

The sixth objection is, that there should have been a deduction of $5000 made from the sum of $10,083 42, the amount due to

the steamers Lioness and Caspian, for bad debts, and for the expenses of collection.   We see no sufficient ground for such a deduction.   The record does not show any such amount of bad debts, or that the expenses of collection were so great.

The seventh and last objection is, that a deduction of $10,000 should have been made from the debts due to the community, for off-sets or claims on the part of the debtors.   We find nothing in the testimony that sustains the claim, and the probate judge was right in rejecting it.

*Judgment affirmed.*

---

*By agreement with the counsel engaged in this case, the opinion of the court was prepared after the return of the Judges from the Western District; and was delivered in New Orleans, the 31st of January, 1842.